# CASES ARGUED AND DECIDED

## IN THE

# SUPREME COURT OF MISSISSIPPI,

### AT THE

## OCTOBER TERM, 1910.

---

WISCONSIN LUMBER COMPANY v. STATE OF MISSISSIPPI, EX REL. JAMES L. GILLESPIE, LAND COMMISSIONER.

### [54 South. 247.]

1. PUBLIC LANDS. *State lands. Sales. Statutes. Construction "Enter." "Purchase." Escheat.*

In statutes providing for the disposition of public lands:—

(*a*) There is no substantial difference between authority to "enter" and authority to "purchase" such lands; and

(*b*) Where a statute forbids the entry of more than a designated quantity of land, by any one person, an entry made in contravention thereof is, by necessary implication, invalid, although the statute contains no express provision to that effect; and

(*c*) Where a statute provides that lands acquired directly or indirectly in contravention of its terms, "shall escheat to the state," it means nothing more than that the lands may be recovered or reclaimed by the state.

2. SAME. *Same. Same. Code* 1892, § 2564, *Laws* 1877, *ch.* 15, *sec.* 3.

There is no substantial difference between Code 1892, § 2564, providing that one person may purchase a designated quantity of public land in one year and no more, and declaring that all lands acquired, directly or indirectly in contravention of the statute should escheat to the state, and the act of 1877 (Laws 1877,

ch. 15, sec. 3), relating to sales by the state of swamp and over-flowed lands, and providing that no person shall be allowed to enter more than a designated number of acres; the words "purchase" in the one statute and "enter" in the other are convertible terms, and the word "escheat" in the code section means nothing more than that the lands might be recovered or reclaimed by the state, and the same result would, by implication, have followed a violation of the Act of 1877.

3. SAME. *Constitutional law. Obligation of contracts. United States Constitution, art.* 1, *sec.* 10. *Constitution* 1890, *sec.* 16. *Supreme court decisions. Rule of property.*

Where a sale of state or public land is valid according to the laws of the state, as expounded and administered by its highest judicial tribunal when the sale was made, its validity and obligation cannot be impaired by any subsequent action of the legislature, or decision of the courts altering the construction of the law, under the Constitution of the United States, art. 1, sec. 10, and the state constitution 1890, sec. 16, prohibiting the passage of laws impairing the obligation of contracts.

FROM the chancery court of Issaquena county.

HON. EMMETT N. THOMAS, Chancellor.

The State, ex rel. James L. Gillespie, Land Commissioner, was complainant in the court below; the lumber company, appellant, was defendant there. From a decree overruling a demurrer to the bill of complaint, defendant appealed to the supreme court. The facts are stated in the opinion of the court.

*Edgar A. Bancroft* and *McWillie & Thompson,* for appellant.

I. *The patents, as issued, were, at most, voidable, and not void.*

A patent is the highest evidence of title. *United States v. Stone,* 2 Wall. 525, 17 L. Ed. 765, 767; *United States v. Maxwell Land Grant Co.,* 121 U. S. 325, 30 L. Ed. 949, 958.

It has already been adjudicated by this court that patents issued in contravention of the Act of 1877 are not void. *Gastrell v. Phillips,* 64 Miss. 473.

Code 1892, § 2564, does not contain the word "void." Even had "void" been used, it would be construed as "voidable." *Franklin v. Kelley,* 2 Neb. 79, 98; *United States v. Winona & St. P., etc., R. Co.,* 67 Fed. 948, 954; *Ewell v. Daggs,* 108 U. S. 143, 27 L. Ed. 682, 684; *State v. Richmond,* 26 N. H. 232, 237; *Allen v. Huntington,* 2 Aik. (Vt.) 247, 16 Am. Dec. 702, 704; *Melms v. Pabst Brewing Co.,* 93 Wis. 153, 57 Am. St. Rep. 899, 903, 904; *Green v. Camp,* 13 Mass. 515, 7 Am. Dec. 169, 170; *Seylar v. Carson,* 69 Pa. St. 81, 87.

There was no violation of the terms of the statute, and the claim of the state must be determined upon equitable principles.

Where a grantor has been induced by fraud to part with the legal title to his property, he cannot reclaim it from subsequent innocent purchasers for value. *Colorado Coal & Iron Co. v. United States,* 123 U. S. 307, 31 L. Ed. 182, 185; *United States v. Winona & St. P., etc., R. Co.,* 165 U. S. 463, 41 L. Ed. 789, 796; *Boon v. Barnes,* 23 Miss. 136, 139, 140; *Dixon v. Doe,* 23 Miss. 84, 85; *Lynch v. United States* (Okla.), 73 Pac. 1095; *State v. Hackley et al.* (La.), 50 South. 772, 775; *United States v. Detroit Timber & Lumber Co. et al.,* 131 Fed. 668, 67 C. C. A. 1, 10, 11; *United States v. B. & M. R. Co.,* 98 U. S. 334, 342, 25 L. Ed. 198; *United States v. Marshall Silver Mining Co.,* 129 U. S. 579, 32 L. Ed. 734, 738; *United States v. California Land Co.,* 148 U. S. 41, 37 L. Ed. 354, 359; *United States v. Stinson,* 197 U. S. 205, 49 L. Ed. 724, 725; *People v. Swift,* 96 Cal. 165, 31 Pac. 16; *Johnson v. Smith,* 21 Tex. 722, 729.

II. *Appellant, the Wisconsin Lumber Company, is a bona fide purchaser for value without notice.*

This question is properly raised by demurrer. Code 1906, § 579. *McKinney v. Adams,* 95 Miss. 832, 50 South. 474, 478, 479; *Graves v. Atkinson,* 68 Miss. 598; *Hackley v. State* (La.), 50 South. 772, 775.

The recital in the deeds acknowledging payment by the grantees of "large and adequate sums of money," is *prima facie* evidence that the appellant was a purchaser in good faith for valuable consideration.    *Hiller v. Jones,* 66 Miss. 636.

The patents, not being required by statute to be recorded, do not operate as constructive notice.    Code of 1892, § 2470. *Patterson v. Langston,* 69 Miss. 400; *Kendrick v. Colyar* (Ala. 1904), 42 South. 110, 112.

A purchaser is chargeable with notice only of instruments appearing in his chain of title.    He is not required to notice a coincidence in dates, and couple together the instruments appearing in various chains of title relating to separate tracts. 23 Am. & Eng. Ency. of Law (2d ed.), 502; Wade on the Law of Notice, §§ 313, 315; *Baker v. Griffin,* 50 Miss. 158, 163; *Harper v. Bibb,* 34 Miss. 472, 485.

There was nothing in the patents and deeds, or the recording thereof, which could have put appellant upon notice that a fraud had been committed on the state.    *United States v. Detroit Timber & Lumber Co.,* 200 U. S. 321, 329–332, 50 L. Ed. 499; *United States v. Clark,* 200 U. S 601, 606–608, 50 L. Ed. 613; *People v. Swift,* 96 Cal. 165, 31 Pac. 16.

The test is not whether the purchaser "had the means of obtaining, and might, by peculiar caution, have obtained, the knowledge in question, but whether the not obtaining of it was an act of gross or culpable negligence," amounting to bad faith. *Spellman v. McKeen,* 96 Miss. 693, 51 South. 914; *Acer v. Wescott,* 46 N. Y. 384, 389, 7 Am. Rep. 355; *Wilson v. Wall,* 6 Wall. 83, 91, 18 L. Ed. 727, 730; *Loughbridge & Bogan v. Bowland,* 52 Miss. 546, 555; *Vest v. Michie* (Va.), 13 Gratt. 149, 31 Am. Rep. 272, 273; *Grundies v. Reid,* 107 Ill. 304, 312; *Anthony v. Wheeler,* 130 Ill. 128, 135, 22 N. E. 494.

The Mississippi recording statutes limit the extent of constructive notice from the records.    *Simmons v. Hutchinson,* 81

Miss. 351, 356; *Work v. Harper,* 24 Miss. 517, 519; *Lewis v. Barnhardt,* 145 U. S. 56, 36 L. Ed. 621, 630, 631.

Nothing is better settled in American and English law than that "the purchaser must have some more authentic means of information than can be found in an application to one who is interested in concealing the truth." 23 Am. & Eng. Ency. of Law (2d ed.), 467; *Bugbee's Appeal,* 110 Pa. St. 331; *National Valley Bank v. Harmon,* 75 Va. 608; 2 Lead. Cas. Eq. (White & Tudor), part 1, p. 50.

Appellant could not have been put upon notice of fraud, because, under a prior decision of this court, no fraud was perpetrated. *State v. Delta & Pine Land Co., infra.*

III. *The decision in State v. Delta & Pine Land Co. established a rule of property.*

A decree "escheating" appellant's property would impair the obligation of a contract, in violation of section 10 of article 1 and deprive appellant of its property contrary to the fourteenth amendment of the United States Constitution. *Hall v. Wells,* 54 Miss. 289, 301; *Rowan v. Runnels,* 5 How. 134, 12 L. Ed. 85, 87; *Ohio Life Ins. & Trust Co. v. Debolt,* 16 How. 416, 14 L. Ed. 997, 1003; *Muhlker v. N. Y. & Harlan R. Co.,* 197 U. S. 544, 49 L. Ed. 872, 878.

The opinion in the *Delta & Pine Land Co. case* would only have to be changed by substituting as the maximum number of acres that might be entered "one quarter section" for "240 acres," to make its language precisely applicable to the case now before the court.

The scope and purpose of the proviso in section 3, Laws of 1877, p. 34, and of Code 1892, § 2564, are precisely the same,— to limit the amount of public land to be acquired by any one person. The penalty in the latter section (except as to the forfeiture of the purchase price) is merely declaratory of the common law, and does not differentiate the two provisions.

The *Della, etc., Company case* was instituted by express direction of the legislature. Its decision on April 25, 1892, occurred twenty-three days after the enactment of the Code of 1892 (April 2d, Code, p. 116), and established a rule of property as to the patenting of public lands. The law as there announced became a part of all patents, contracts and conveyances of public lands thereafter executed; and many thousands of acres of public lands have been purchased upon its faith. It was unchanged by later decision or legislative enactment, when the patents here in controversy issued, and when appellant, seven years later, paid full value for these lands.

The averment of the bill that Aden, Grubbs and Johnson "applied to the land commissioner of the state of Mississippi to purchase the land hereinafter described," and paid the money therefore,—with no averment that the state's officers were privy to the conspiracy,—clearly indicates that the *Delta* decision was recognized and acted upon by the executive departments of the state government. Under that decision, the land commissioner was justified in issuing patents in accordance with the letter of the section where the purchase price was tendered and the number of persons receiving quarter sections was equal to the number of such tracts and none of them had, within the year, purchased public lands. He properly regarded it as immaterial "how or by whom they were paid for," or that the lands "were quickly resold by the patentees," or that the contract for resale had been made before the patents issued. Notwithstanding that three persons were applying to the land commissioner "to purchase" a large number of tracts, this was not deemed—nor was it in fact, under the *Delta* decision—a suspicious circumstance.

Therefore, appellant's purchase, "was valid by the laws of the state, as then expounded by all departments of the government and administered in its courts of justice," and "its validity and obligation cannot be impaired by any subsequent action of legis-

lation or decision of its courts altering the construction of the law." *Hall v. Wells,* 54 Miss. 289, 301.

In the above case, it was held that the popular construction given to the words "orphans' business," in the Constitutions of 1817 and 1832, that they included a minor whose father was alive, having been accepted and acted on by the legislature and the people, and by the courts of original jurisdiction until the decision in *Stewart v. Morrison,* in 1860, will, of itself, cause titles acquired as such guardians' sales prior to that decision to be upheld. And this court, by Simrall, C. J., said (p. 301) :

"Assuming that this long continued practical rendering of the words was an error, yet the principle is well settled that the practical construction given to a statute or Constitution by the officers of state, and acted upon by the people, is decisive. *Union Ins. Co. v. Hoge,* 21 How. (U. S.) 35, 16 L. Ed. 61. Contemporaneous construction under which rights of property have been acquired should be followed, if possible. *In re Warfield,* 22 Cal. 51, 83 Am. Dec. 49. These are persuasive reasons why the courts should not overturn long established practical construction, although erroneous.

"But the principle has a wider and more benificent range. If the courts do place a different construction on a statute or Constitution from that long acquiesced in practically, contracts made or rights of property acquired before the change shall be respected. The rule was clearly announced and applied in *Gelpcke v. Dubuque,* 1 Wall. (U. S.) 175, 206, 17 L. Ed. 520, 'that if the contract when made was valid by the laws of the state, as then expounded by all departments of the government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent action of legislation, or decision of its courts altering the construction of the law.' Also *Ohio Life Ins. & Trust Co. v. Debolt,* 16 How. (U. S.) 416, 432 (14 L. Ed. 997) ; *Havemeyer v. Iowa County,*

3 Wall. (U. S.) 294, 303, 18 L. Ed. 38; *City v. Lamson,* 9 Wall. (U. S.) 477, 482, — L. Ed. 725; *Milligan v. Dickson,* Pet. C. C. 433, 439. The last case had reference to the validity of a deed and title under which the party held his property. Upon no theory can security be given to contracts and titles, and at the same time progress and improvement be made in jurisprudence, but by shaking off the errors of the past, while we uphold contracts made and titles acquired while the error prevailed."

In *Rowan v. Runnels,* 5 How. (U. S.) 134, 12 L. Ed. 85, the United States supreme court held that it would enforce contracts made between the first day of May, 1833, and the 13th day of May, 1837, in accordance with the construction of the Mississippi Constitution which it had given in *Groves v. Slaughter,* 15 Pet. 449, though the courts of Mississippi had, since the decision in *Groves v. Slaughter,* placed a construction on the state Constitution that would render such contracts void. The court, by Chief Justice Taney, said (p. 87):

"Undoubtedly this court will always feel itself bound to respect the decision of the state courts, and from the time they are made will regard them as conclusive in all cases upon the construction of their own constitution and laws.

"But we ought not to give to them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other states, which in the judgment of this court were lawfully made."

And in *Ohio Life Ins. & Trust Co. v. Debolt,* 16 How. 416, 14 L. Ed. 997, Mr. Chief Justice Taney referred to the case of *Rowan v. Runnels, supra,* and said (p. 1003):

"It is true the language of the court is confined to contracts with citizens of other states, because it was a case of that description which was then before it. But the principle applies with equal force to all contracts which come within its jurisdiction.

"Indeed, the duty imposed upon this court to enforce con-

tracts honestly and legally made, would be vain and nugatory, if we were bound to follow those changes in judicial decisions which the lapse of time, and the change in judicial officers, will often produce. The writ of error to a state court would be no protection to a contract, if we were bound to follow the judgment which the state court had given, and which the writ of error brings up for revision here. And the sound and true rule is, that if the contract, when made, was valid by the laws of the state, as then expounded by all the departments of its governments, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the state, or decision of its courts, altering the construction of the law."

In *Muhlker v. N. Y. & Harlem R. Co.,* 197 U. S. 544, 49 L. Ed. 872, the court said (p. 878):

"When the plaintiff acquired his title, those cases (the elevated railroad cases) were the law of New York, and assured to him that his easements of light and air were secured by contract as expressed in those cases, and could not be taken from him without payment of compensation.

"And this is the ground of our decision. We are not called upon to discuss the power, or the limitations upon the power, of the courts of New York to declare rules of property or change or modify their decisions, but only to decide that such power cannot be exercised to take away rights which have been acquired by contract and have come under the protection of the Constitution of the United States. And we determine for ourselves the existence and extent of such contract. This is a truism; and when there is a diversity of state decisions the first in time may constitute the obligation of the contract and the measure of rights under it. Hence, the importance of the *Elevated Railroad cases* and the doctrine they had pronounced when the plaintiff acquired his property. He bought under their assurance."

So here, appellant bought these lands under the assurance of the decision in the *Delta case,* that patents, regular upon their face, for which full consideration had been paid, issued to persons who had not before bought public lands within the year, were valid:—an assurance strengthened and confirmed by the actions of the executive department of the state and the non-action of the land commissioner and the attorney-general for more than seven years. To reverse that decision, and destroy by a contrary decision the validity of patents and conveyances made while that decision stood, would impair their obligation and violate section 10 of article 1 of the Constitution of the United States. It would also deprive appellant of its property without due process of law, contrary to the fourteenth amendment. *Muhlker v. N. Y. & Harlem R. Co., supra.*

IV. *The lands in suit were tax lands, and not public lands, within the meaning of the statute placing a limitation on the acreage one person might acquire.*

The lands were sold by virtue of Code 1892, § 2578, as amended by Laws of 1894, p. 73.

The amendment of 1894 shows that tax lands do not fall within the scope of section 2564.

Besides, the 1894 act provides that certain classes might acquire more than a quarter section of tax lands, and the bill nowhere charges that either the so-called conspirators or patentees were not the previous owners of the lands in dispute.

V. *The state is equitably estopped from proceeding in this case.*

The state as a litigant stands on no higher plane than the citizen. *United States v. Clark,* 138 Fed. 294, 299; *United States v. Maxwell Land Grant Co.,* 121 U. S. 325, 30 L. Ed. 949, 959.

The equities are all on the side of appellant. The doctrine of estoppel applies to the government as well as to individuals.

*United States v. Stinson,* 197 U. S. 200, 204, 205; *Walker v. United States,* 139 Fed. 409, 412; *Fletcher v. Peck,* 6 Cranch. 87, 138, 139; *Simpson v. Stoddard County* (Mo.), 73 S. W. 700, 709–711; *United States v. Blackburn* (Ariz.), 48 Pac. 904; *Cochran v. Cobb,* 43 Ark. 180, 184.

A court of equity "never lifts its hand by affirmative action hurtful to a purchaser *bona fide* for valuable consideration." *Dunfee v. Childs* (W. Va.), 53 S. E. 209, 218.

*Mayes & Longstreet* and *Green & Green,* representing their respective clients, whose interests in other lands would have been injuriously affected by an affirmance of the decree appealed from, by consent of the court and of appellants' counsel, filed elaborate and able briefs, urging that the decree of the court below should be reversed.

*Anderson, Vollor & Foster,* for appellee.

Code 1892, § 2564, reads: *"Quantity Purchased by One Person.*—One person may purchase as much as one-quarter section of the public lands in one year, and no more; and all lands acquired directly or indirectly by any person in contravention of this and the preceding sections, shall escheat to the state, and all moneys and fees paid therefore shall be forfeited."

Code 1892, § 2565, reads: *"Suits for on Behalf of Public Lands.*—The land commissioner may prosecute suits, in the name of the state, concerning public lands, through the attorney general, or some attorney at law employed by him for that purpose, with the consent of the governor."

This suit is predicated on the two sections above quoted, sections 2564 and 2565, and the further fact that while it is not specifically alleged in the bill of complaint filed herein, the exhibits show that the lands sued for were forfeited state tax lands held by the land commissioner in his land office under and by virtue of the provisions of Code 1892, § 2566, *supra.*

Not until the expiration of the two years' time for redemption did the land commissioner have authority to deal with these tax lands as with other state lands; that up to the expiration of the time for redemption they were held for a special purpose, to-wit: Subject to the owner's right to redemption, and could not be disposed of under the general law to the public generally. It is provided in chapter 14, p. 33, Laws 1877, that the governor should appoint a commissioner of swamp lands, who should receive from the secretary of state all books, papers, records, etc., pertaining to the location, election and sale of swamp lands in this state, and who should be authorized to sell and dispose of said swamp lands remaining unsold, for cash, and at a price not less than twenty-five cents per acre, the funds received from the sale of said lands to be paid into the treasury upon warrant of the auditor of public accounts to the credit of the Swamp Land Fund; "Provided that no person shall be allowed to enter more than 240 acres under the provision of this act."

"The words 'public lands' used in our legislation mean such as are subject to sale or other disposal under general laws." *Newhall v. Sanger,* 92 U. S. 761, 23 L. Ed. 769, and Rose's Notes, 877; *Barden v. N. P. R. R. Co.,* 145 U. S. 535, 36 L. Ed. 806, Rose's Notes, 222; *Menn v. Tacoma Land Co.,* 153 U. S. 273, 38 L. Ed. 714, 6 Words & Phrases, 5793–5795.

"Public lands comprise the general and public domain; unappropriated lands; the lands not held back or reserved for any special or governmental or public purpose." *United States v. Garreston,* 43 Fed. 22, 24.

The contention of counsel for the defendant is that said patents were not void, but voidable only, and therefore an innocent purchaser thereof without notice would be protected; and even if they were void, the innocent purchaser would be protected under the provisions of Code 1906, § 2925.

We think that the effect of the provisions of section 2564, which declare that all lands acquired in contravention of that section shall escheat, means exactly the same as is provided in the preceding section 2563, which says that a patent issued in contravention of the section shall be void, for it will be noticed that under the provisions of section 2564 the lands acquired in contravention of that section and also of the preceding section escheat. In other words, the legislature means to say in both sections, and that is the manifest effect of the sections, that patents acquired in contravention of those provisions shall be void and the lands themselves shall escheat to the state, and all moneys and fees paid therefor shall be forfeited. In our judgment, there is no way to escape this conclusion. The statute itself settles the question that the title is absolutely void and not voidable merely, leaving nothing for the court to construe. Therefore, it is immaterial whether we give to the term "escheat" in the statute its technical and ordinary meaning, or otherwise. But let us notice for awhile the law of escheat in its technical and ordinary use, and see how it affects our contention.

It will be observed that this is a new ground for escheat from that handed down to us through the old common law, but we have got to take it as it is.

What do we understand by the term escheat? Under the old common or English law, "Escheat is an obstruction in the course of descent and consequent destruction of the tenure, by some unforeseen contingency, in which case the land naturally reverts back, being a kind of reversion to the original grantor of the fee or the land of the fee." Bl. Comm. 15.

"In American law, 'escheat' signifies a reversion of property to the state in consequence of the want of any individual competent to inherit. The state is deemed to occupy the place and hold the rights of the feudal lord." 4 Kent, Comm. 423, 424; 3 Words & Phrases, 2463.

In order to judicially determine whether the property had escheated, a proceeding was instituted which, with its determination was called "inquest of office" or "office found."

These terms, which are synonymous, mean a proceeding, which contains the finding of fact, to ascertain whether or not the land has escheated to the grantor or state, as the case may be, and to put such grantor or state in possession thereof, or to find whether or not land has been acquired by an alien. It is really a proceeding to ascertain whether, in the particular case, the state has a right to the lands in question. 6 Words & Phrases, 4931, 4932; *Phillips v. Moore,* 100 U. S. 208, 25 L. Ed. 603; *Strictly v. Hill,* 62 Pac. 893, 83 St. Rep. 786; 11 Am. & Eng. Ency. of Law, *et seq.;* 16 Cyc. 549, *et seq.*

Under this section 2564 it will be seen that a new cause and proceeding for escheating property is created, although, under the code chapter of escheat, Code 1906, § 1892, the land commissioner is vested with the power and authority of discharging all the duties of the regular escheator.

When does the title of escheated property vest? It is stated by some of the authorities as follows: "Inasmuch as the freehold must always vest somewhere, the authorities uniformly hold that where there is a defect of heirs, title passes at once." 11 Am. & Eng. Ency. of Law, 328 and note; 16 Cyc. 552, *et seq.*

Another authority states the rule as follows: "In a majority of the United States the title to escheated property vests at once in the state without inquest of office or office found, and such a proceeding is merely a means by which the state furnishes evidence of title. 8 Ency. Pl. & Pr. 1 and 2. See especially *Ellis v. State* (Tex.), 21 S. W. 66. This case is squarely in point on all these issues.

This is manifestly the rule under our statutes. In Code 1892 (1880), § 1703, it is provided that the escheator shall in proper cases institute proceedings "to have the escheat judicially de-

clared." Not for the purpose of creating an escheat, but for the purpose of having an escheat which already exists "judicially declared."

A plaintiff does not bring an action of ejectment to create his title and right of possession to land, that already exists, but simply to have his existing right and title judicially declared; and such a judicial declaration does not fix this right and title as beginning at the time of finding, but as beginning from the time they came into existence.

In Code 1892 (1884), § 1707, it is provided that a person in possession of escheated property shall be liable for the rent of real estate and hire of personal property whether he claim title or not; and where the escheat is established, the court shall determine and decree rent or hire to the state; and in case the party in possession refuses or fails to deliver possession after decree, he shall be liable for double the value of the rent or hire for such time. It is manifest from the reading of this statute that the rents first provided for are from the time the right of the state first obtained, whereas, the double rent is from the date of the decree declaring the escheat.

Again, the violation of Code 1892, § 2564, and the preceding sections, renders the title void *ab initio,* and the rule is that as a matter of law a void title fails the moment the deed or patent is made.

And this is exactly our contention, that no title under the terms of this section ever passed from the state into the nominal patentees or the real fraudulent beneficiaries thereof, and that as no title passed from the state, neither the real nor the nominal purchasers got any title, and therefore no vendee from them or successive vendees got any title.

In further support of their contention that the patents were not void, but only voidable, counsel claim that this section is substantially a transcript of the proviso appearing in the acts

of 1877, chapter 14, p. 34, § 3. And then they refer to and rely upon the decisions of our own supreme court in construing that statute in the reported cases of *Phillips v. Gastrell,* 62 Miss. 362, and same case in 64 Miss. 473, and the unreported case of *State v. Delta Pine Land Company,* decided April 25, 1892. From this last case, which we confess we had never seen until it was read to the lower court on the argument therein, is quoted at great length in paragraph 2, page 13, of defendant's brief, presented to the chancery court, and is copied in full as Appendix A to said brief, as it is in the brief of appellant filed in this court. With all due respect to counsel, we beg to say that the proviso in this act of 1877 and that in section 2564 are as far apart as the poles, and as different in their terms as it is possible to make them. The act of 1877 is as follows, and please carefully note its reading: "Provided that no person shall be allowed to enter more than 240 acres under the provisions of this act." It will be noted, in the first place, that there is no prohibition whatever in this statute on the party purchasing, but the prohibition is entirely upon the land commissioner. The statute is in plain English that the swamp land commissioner shall not allow any person to enter more than 240 acres, but the statute does not say that the person may not enter more than that if he may be allowed to do so by the officer in charge. Suppose the officer in charge should violate his duties and allow it to be done, the purchaser has violated no statute, is not punishable for doing so, and gets a title which cannot be said to be void, but only voidable, and that only while in his own hands or in the hands of some person who might be cognizant of the transaction.

In the second place there is no penalty whatever prescribed by this statute in so far as the purchaser is concerned. It does not say that his title shall be void if obtained in contravention of that statute, or that it shall escheat to the state, or that the

money paid therefor shall be forfeited. Nothing of that kind appears in the statute, therefore, we have no sort of war to make upon the case of *Phillips v. Gastrell,* nor is it necessary for us to make any war upon the unreported case of the *State v. Delta Pine Land Co.,* as the court in both these cases were dealing entirely with the statute of 1877, *supra,* and was construing that and no other. We pause to remark, however, as to the last case, that the court seemed to have gone so far and to have taken such a doubtful position that it was thought best that the case should not be reported, giving the court an opportunity to recede from the decision there taken if at any time it should think best to do so.

Now, let us turn from this statute of 1877 to Code 1892, § 2564, under which we are proceeding.

First, we desire to emphasize the fact that the cases above referred to, of *Phillips v. Gastrell* and *State v. Delta Pine Land Co.,* were decided before the adoption of the Code of 1892, and the enactment of section 2564 therein, and that it is as plain as plain can be that the provisions of section 2564 were enacted for the very purpose of repealing the act of 1877, *supra,* and of doing away with the construction placed thereon by our supreme court in the cases referred to above. The legislature proposed, therefore, to so fix the law that there could be no chance for the court to construe a patent issued under this section as being voidable only, and as to allow a patent to a purchaser of more than one-quarter section of the public lands in one year to be valid for any purpose. In other words, the sole object was to make the law on this subject so plain that it could not be susceptible of a construction in favor of the validity of a patent issued in contravention thereof.

The court will notice, therefore, that the legislature prescribed that as much as one quarter-section of the public lands in one year might be purchased by one person, and no more. It does

not say that it will be allowed to be purchased. It eliminates that word "allowed" altogether, so that the land commissioner shall have no discretion or option in the matter, but puts the burden and penalty entirely upon the purchaser himself. But, it goes further, and says that "all lands acquired, directly or indirectly, by any person or persons, in contravention of this and the preceding section, shall escheat to the state," that is, shall be void absolutely and unequivocally, "and all moneys and fees paid therefor, shall be forfeited," that is, shall be lost to the purchaser and forever held by the state.

As above stated, we can see no chance for a quibble upon the plain meaning and reading of this section. The court will notice, however, that counsel say that this section 2564 is substantially the provision of the act of 1877, *supra,* the only material change being that the quantity of land allowed to be purchased by any one person in any one year was reduced from 240 acres in the acts of 1877 to one quarter section in the Code of 1892, § 2564. With due respect to counsel and the court, it seems to us that this contention is simply absurd.

Now, what becomes of the two cases relied on? The rule announced therein died when the act of 1877 died. As the two statutes are so radically unlike, and as these cases only construed the act of 1877, no rule of property could possibly have been established as to cases arising under the statutes which we are invoking, hence there can be nothing in that contention of counsel. But counsel contend that defendant is an innocent purchaser without notice, and is therefore protected by the provisions of Code 1906, § 2925. This section reads as follows:

*"Fraudulent Purchases Declared Void.*—All fraudulent purchases of public lands heretofore made are void, excepting the rights of innocent purchasers without notice;" "and moneys and fees paid in furtherance of any such fraudulent purchase are forfeited to the state."

(a) It will be observed that this section first appeared in the Code of 1892 as section 2587. Its reading shows that it was entirely retroactive, there being nothing prospective in it. It clearly appears from what has already been said and shown, that this section was put into the Code of 1892 for the purpose only of protecting innocent purchasers of public lands made under the provisions of section 3, chapter 14, page 34 of the acts of 1877, which we have already fully considered and analyzed.

The first thing that section 2585 did was to declare all patents issued under the acts of 1877 to be void, but inasmuch as that act reads as it does, and had been construed by the supreme court as being voidable only, and therefore not applicable to innocent purchasers, the legislature in this section 2586 undertook to preserve and safeguard the rights of innocent purchasers under said act; and in doing that, it also undertook to safeguard the rights of innocent purchasers as to any other class of public lands that might have been purchased under the chaotic state of the law on that subject existing prior to the enactment of the land office chapter in the Code of 1892. But the legislature did more than this, in the enactment of section 2586. It declared that all fraudulent purchases of lands, made prior to 1892, were void and not voidable merely. The only prospective statute on that subject in the Code of 1892, was section 2564, and it declared in legal effect that all fraudulent purchases of public lands should, from that time henceforth, be absolutely void, and that purchasers of any such lands, however innocent they may be, regardless of the fact that they may have purchased without notice and for a valuable consideration, should have no rights that were entitled to be protected or safeguarded, but they took only such title as the original patentees may have gotten, which were absolutely void.

From the time of the enactment of the Code of 1892 to the enactment of the Code of 1906, there was no such legislation

as that appearing in section 2586, *supra,* and all purchases made
of public lands were subject entirely to the provisions of Code
1892, § 2565.   The lands in this litigation, it will be noted,
were all patented between the enactment of these two codes, so
that at the time these patents were issued this section 2925, or
any similar section was not in existence.   The claim now is that
this section now appearing for the first time in Code of 1906
has the effect to cure the infirmity complained of and to safe-
guard and preserve the alleged rights of defendant as an inno-
cent purchaser without notice.   The effort is to breathe life into
a body that has been dead for from seven to nine years, a thing
we submit it is impossible for man to do.   The fact is that these
patents under the Code of 1892 were absolutely void from their
inception and that in consequence thereof, no title had ever
passed out of the state; and that being true, it was impossible
for defendant to get any title.

(b) But we are clearly of the opinion that this section, Code
1906, § 2925, as it now reads, should never have been in this
land office chapter at all, or anywhere else in this code for that
matter; that it got there in that shape by mere inadvertance and
in consequence of the method adopted in getting up this code.

The court is referred to the act of March 18, 1904, with ref-
erence to the preparation of the Code of 1906.   Section 1 of that
act reads as follows:—"Be it enacted by the legislature of the
state of Mississippi, that the governor be, and he is hereby au-
thorized and directed to appoint three suitable persons, one from
each supreme court district, learned in the law, as commission-
ers, whose duty it shall be to revise, arrange and classify all the
statute laws of this state of a general nature into one code, in-
cluding all such laws of a general nature as are now in force,
and that may be passed at the present session of the legislature,
and index the same."   It will be seen that the duties of these
code commissioners were simply to bring forward all the laws of

a general nature in the Code of 1892, then in force, and those which were subsequently passed by the different legislatures, and which were still in force, and also such laws as might be passed at that session of the legislature of 1906. This was practically nothing but a collation of the laws then in force and those which should be passed at that session of the legislature, and putting them into code form and calling them the Mississippi Code of 1906. It is true that for the purpose of making it a legal code it was necessary for the legislature to do what it did, that is, to enact the same into law, and thereby declare it to be the Code of 1906. Still, the method adopted to get it up was the one we have suggested, and the effect was that it was nothing but a collation of existing laws, together with those that were passed during the session of 1906.

Under that provision, by mistake or inadvertence, this section 2586 of the Code of 1892, as it appeared in that code was transferred bodily and in terms into the Code of 1906 as section 2925. But we submit again, to have the effect, and the effect only, of the section as it originally appeared in the Code of 1892, and have reference only to fraudulent purchases of public lands made prior to the adoption of the Code of 1892.

This idea is further strengthened by the fact that this section 2925 was not enacted by the legislature of 1906, except by the adoption of that code, and does not otherwise appear in the published acts of that section.

(c) But, if mistaken in this view, still we contend that this section 2925 was never intended to apply to patents acquired in contravention of Code 1892, § 2564, under which we are proceeding, and therefore did not have the effect to cure the infirmity of such titles. Our contention is, and we think we are clearly right in making it, that this section 2925, if it is entitled to any place at all in the code, was intended to apply only to lands fraudulently purchased prior to the Code of 1892, and to

have only the effect which section 2585 of the Code of 1892 had; *"Fraudulent Purchases Declared Void.*—All fraudulent pur- that the section was intended, therefore, to read as follows: chases of public lands made prior to the adoption of the Code of 1892 are void, excepting the rights of innocent purchasers without notice; and moneys and fees paid in furtherance of any such fraudulent purchase are forfeited to the state." If the section was intended at all to apply to the fraudulent purchase of any public lands under the land office chapter of Code 1892, it was evidently intended to apply to such lands other than those mentioned in section 2564 and preceding sections.

It specifically says that "all fraudulent purchases of public lands heretofore made are void, etc.," and while the lands acquired in contravention of Code 1892, § 2563, may be said, in a sense, to be fraudulent, yet the statute does not so state in terms, and the section under consideration must therefore have had reference to some other class of frauds than those referred to in the section under which we are proceeding. There are many instances of fraud which we might mention, that could have been referred to, and to which it was intended that it should be applied; for instance, Code 1892, § 2572, provides that the land commissioner or any of his employes, shall not be directly or indirectly interested in the purchase or sale of any lands now belonging to or that shall hereafter be acquired by the state, and makes it a misdemeanor for them to do so. This is one class of fraud that would be covered by the section and all through that chapter may be found other prohibitions the contravention of which would be a fraud, to which this section may apply.

Argued orally by *R. H. Thompson,* for appellant and by *George Anderson,* for appellee.

ANDERSON, J., delivered the opinion of the court.

This is a bill by the state, the appellee, on the relation of the land commissioner, against the Wisconsin Lumber Company, the appellant, to have declared void the claim of appellant to a large quantity of land in Issaquena and Sharkey counties, and "escheat" the same to the state. Appellant demurred to the bill. The demurrer was overruled, from which decree appellant was granted this appeal to settle the principles of the cause.

The bill sets out substantially these facts: That in 1899 and 1900 H. B. Aden, W. G. Grubbs, and B. C. Johnson, desiring to purchase and get possession of a large quantity of the public lands belonging to the state in Issaquena and Sharkey counties, for the purpose of speculating therein, and being familiar with the statutes of the state limiting the purchase of such lands to not more than one quarter section by one person in any one year, entered into a scheme and conspiracy with ninety-six other persons (appellant not being one of the conspirators) "to directly or indirectly evade and contravene the provisions of the land office chapter [chapter 73] of the [Annotated] Code of 1892, especially section 2564 thereof." That in furtherance of such scheme the said Aden, Johnson, and Grubbs, by and with the consent of such other persons, on February 14, 20, 21, March 2 and 4, and April 3, 1899, and May 24, 1900, applied to and purchased from the state, through the land commissioner, a large quantity of the public lands in the names of such other persons, to whom patents were duly issued, which were recorded in said counties of Issaquena and Sharkey. "That all of said purchases were made for the sole benefit of the said Aden, Grubbs, and Johnson, for the purpose, as aforesaid, of indirectly acquiring said lands in contravention of said section 2564, Ann. Code 1892, and the preceding sections of the chapter, entitled Land Office, and were not made in good faith by the respective purchasers thereof. That in fact no money whatever was paid

97 Miss.—38

by said parties, who appeared to be the purchasers of said lands, and to whom the patents were actually issued; but that the money so paid to the land office was paid by the said Aden, Grubbs, and Johnson for their own benefit as aforesaid." That in furtherance of such conspiracy the said patentees, a few days after said patents were issued to them, conveyed all of said lands to either the said Johnson or the said Grubbs, some being conveyed to one and some to the other, to whom deeds were made and duly recorded in the deed records of the counties of Issaquena and Sharkey, and that afterwards, by various deeds, said lands were conveyed by said Johnson and Grubbs "to a succession of vendees, until finally they were conveyed to one T. R. Lyon, as shown by the different deeds recorded in the records of said counties." That on October 29, 1907, and on July 15, 1908, the said Lyon conveyed all such lands to the appellant, a nonresident corporation, now in possession thereof, claiming title to the same. That by reason of such conspiracy and fraud the title to said lands never passed out of the state. That the patents were void *ab initio,* and therefore the appellant got no title thereto. There is no charge in the bill that appellant either knew of or participated in the alleged fraud; but that appellant was not a *bona fide* purchaser for value, because it had constructive notice of such fraud, as shown by the records of said patents and deeds, which constituted part of its chain of title. The bill contains a description of the lands, with the name of each patentee, the quantity of land patented to each, the price paid the state ($1 per acre), showing that there was not more than one quarter section purchased by any one of the patentees in either one of said years 1899 or 1900. The grounds of demurrer raise the question whether there is any equity on the face of the bill.

It is contended that the case of *State v. Delta & Pine Land Company,* decided by this court in 1892, is conclusive of this

case in favor of appellant. That case, being unreported, the opinion therein delivered is herein set out:

"*State of Mississippi v. Delta & Pine Land Co.*

"WOODS, J., delivered the opinion of the court:

"It would be rash to affirm that the state has ever had any fixed policy in its legislation touching what are known as its swamp and overflowed lands. The statutes providing for the disposition of these lands reflected the shifting views of the several legislatures which undertook to deal with them. The prices of the lands have varied, from time to time, by legislative enactment, from ten to fifty cents per acre. Now and then preference in purchase has been declared in favor of the actual settler upon the lands; and the terms and conditions have varied from time to time. If there has ever been any fixed policy, it has extended no farther than that of putting the lands in the hands of private owners and so thereby subjecting them to taxation.

"The manner of the acquisition of the patents to the lands embraced in this litigation neither violated the letter nor the spirit of acts 1877, c. 15. In the proviso to the third section of this act it is declared that no person shall be allowed to enter more than 240 acres of said lands under that act. What the purpose designed to be subserved by this proviso was, it is impossible now to say with any degree of certainty. That it was designed to secure homesteads to the patentees nowhere appears. There is no hint of any such purpose, either in this act or in any other general legislation touching the same subject-matter. The object contemplated may have been to prevent persons generally from being deprived of what was then esteemed the poor privilege of securing patents to these lands by preventing large entries by single individuals. If this was so, the record fails to show that any single person was deprived of the privilege by the particular manner employed in the sales of the lands in controversy.

"The lands were sold to a large number of persons and in tracts not exceeding 240 acres. How or by whom they were paid for is immaterial; and that they were quickly resold by the patentees at an advanced price confessedly is also immaterial. There can be no decent pretense for contending that, under the law, the patentees were required to settle upon the lands or occupy them as homesteads. The sole condition of sale was the payment of an acreage price of twenty-five cents per acre by the patentee. Having entered the lands and paid for them, it was clearly the right of the owner to sell them as and to whom he would. We are unable to see that a contract to resell before entry at all affects the validity of the entries. Nor do we see how the fact that Evers advanced the purchase price of the lands to the patentees can be held to affect their right to subsequently resell at an increased price, even in pursuance of a contract made before the lands were entered.

"Who was wronged by the course pursued? The state received the full price demanded for its lands, sold in tracts of 240 acres, and no private person is even suggested as having been prevented from making any purchase desired. No public policy was infringed, and tens of thousands of acres of lands held by the state were placed upon the tax rolls, and subjected to taxes in the hands of private owners. Who was injured? What wrong was done? Wherein was the spirit or letter of the law offended. The equities of the case are with respondents too. For nine years the state has acquiesced in the transaction without complaint or dissent. The lands have passed out of the hands of the patentees and their vendees, and have been borne during all these years upon the assessment rolls, and have been subjected to the burdens of taxation, in the hands of their owners, to the extent of thousands of dollars. The sales complained of were not made secretly or in a corner, but openly and with the full knowledge and long acquiescence of the state.

"The decree of the chancery court must be affirmed.

*"Affirmed."*

It is contended for the state that the statute in question here (section 2564, Ann. Code 1892) is materially different from the statute construed in that case (the proviso to section 3, p. 34, Laws 1877), and therefore it is not authority for appellant. The last clause of section 3, p. 34, Laws 1877, provided: "That no person shall be allowed to enter more than 240 acres under the provisions of this act." While section 2564, Ann. Code 1892, provided: "One person may purchase as much as one quarter section of the public lands in one year, and no more; and all lands acquired, directly or indirectly, by any person in contravention of this and the preceding sections, shall escheat to the state, and all moneys and fees paid therefor shall be forfeited." Is there any difference in the purpose and effect of these two statutes, beyond that of the maximum quantity of public lands allowed by each to be purchased by any one person? Each declared, for the period it was in force, the public policy of the state with reference to such lands. There is no *real* difference in the inhibition contained in the respective statutes. In the act of 1877 it is against any person being "allowed to enter more than 240 acres of land," etc. In section 2465 it is against the " 'purchase' by one person of more than one quarter in one year." "Enter" and "purchase" in these statutes are convertible terms. The penalty added to section 2564, that "all lands acquired, directly or indirectly," in violation of law, "shall escheat to the state," is the "universal penalty for the violation of such statutes, whether expressed or not." If not written in the statute, the law writes it there. Fraud is fraud, whether perpetrated "directly or indirectly." The law would write into the act of 1877 the penalty expressly written into section 2564. The term "shall escheat," in section 2564, means nothing more than "shall be recovered," or "shall be reclaimed."

Section 2564 is subject to exactly the same construction as that put upon the act of 1877 by the court in *State v. Delta & Pine Land Co., supra.* We have examined the record in that case. The facts are strikingly similar to the facts of the case at hand. The court said in that case: "The manner of the acquisition of the patents to the lands embraced in this litigation neither violated the letter nor the spirit of acts 1877, c. 15. *  *  * How and by whom they [the lands] were paid for is immaterial; and that they were quickly resold by the patentees at an advanced price confessedly is also immaterial. *  *  * We are unable to see that a contract to resell before entry at all affects the validity of the entries. Nor do we see how the fact that Evers advanced the purchase price of the land to the patentees can be held to affect their right to subsequently resell at an increased price, even in pursuance of a contract made before the lands were entered."

There is no escape from the conclusion that that case is decisive of this, in favor of appellant. The ruling in that case, however, is so manifestly unsound and mischievous in its effect that it is hereby overruled. Nevertheless, as contended by appellant, it was a rule of property, covering the period of the transactions here involved. It is the law of this case. To hold otherwise would violate section 16 of the Constitution of 1890 of the state, and section 10, art. 1, of the federal Constitution, denying the state the right to pass any law impairing the obligation of contracts. If a contract when made was valid under the laws of the state as then expounded and administered in its courts of justice, "its validity and obligation cannot be impaired by any subsequent action of legislation, or decision of its courts altering the construction of the law." *Hall v. Wells,* 54 Miss. 289 (op. 301); *Rowan v. Runnels,* 5 How. 134, 12 L. Ed. 85; *Ohio Life Ins. & Trust Co. v. Debolt,* 16 How. 416, 14 L. Ed.

997; *Muhlker v. N. Y. & H. R. Co.*, 197 U. S. 544, 25 Sup. Ct. 522, 49 L. Ed. 872.

These views render it unnecessary to pass on any other question raised.

*Reversed and remanded.*

Afterwards, on motion of the appellant, the appellee admitting that it would be useless to remand the cause for further proceedings, a final decree was rendered in appellant's favor, denying the complainant all relief and dismissing the suit.